7595

## FIRST NATIONAL BANK OF RICHMOND, IND., v. BADHAM.

1. NOTES—NEGOTIABILITY.—A note otherwise negotiable is not rendered non-negotiable by a provision for attorney's fees in case it is necessary to employ an attorney to collect.

   MR. JUSTICE GARY *dissents*.

2. IBID.—IBID.—A provision in a note "for value received in one machinery as per contract of Nov. 23, 1899," does not render the note otherwise negotiable, non-negotiable.

   JUDGE DEVORE, *Acting Associate Justice, dissents*.

3. RESCISSION OF CONTRACTS.—There can be no rescission of an executed contract of sale for breach of warranty, except: (1) where this right is given in the contract of purchase; (2) where the seller is guilty of fraud; (3) where there has been an entire failure of consideration.

4. JURY—DISCRETION OF TRIAL JUDGE.—Whether the jury may have any writings in evidence in their room during their deliberations is discretionary with the trial Judge.

5. NEGOTIABLE INSTRUMENTS.—SECTION 255B, CODE OF PROCEDURE, relating to suit on negotiable instruments before due in certain cases, has no force in deciding if a note providing for attorney's fees is negotiable.

Before MEMMINGER, J., Richland, November, 1906. Reversed.

Action by First National Bank of Richmond, Indiana, against V. C. Badham. Plaintiff appeals from judgment for defendant on following exceptions:

1. "Because his Honor erred in the admission of testimony on the issues of whether the erasure of the printed provision for attorney's fees in the two notes sued on herein had been made by the defendant, or without his consent. His Honor, over plaintiff's objection, permitted the witness, Meighan (who, as bank collection clerk, had handled other notes executed to defendant, Badham, on printed forms like the two notes in question), to testify that the printed attorney's fee clause was not erased in the said other notes; plaintiff objecting that such testimony was

irrelevant, and that the fact that the clause 'was not erased in other notes does not tend to prove that it was not erased on these notes,' and his Honor holding and stating, 'does not prove that it was not erased on this note, but would be some evidence on that point,' and allowing defendant's attorney to ask the question, 'Do you recall ever having seen one of these notes of Mr. Badham with the clause to which I called your attention erased?' and allowing, over objection, the witness to answer, 'No, sir; I do not recall ever seeing one of the Badham notes with this erasure before.' It is submitted that the testimony was irrelevant and misleading in its effect upon the minds of the jurors, and that the effect was further prejudicial because his Honor stated that the said testimony throws light on the question.

2. "Because his Honor erred in allowing the defendant, Badham, over plaintiff's objection, to testify as to his relations with the machinery company to which he had endorsed the notes sued on herein; such testimony being conclusions from catalogues and correspondence which should have been produced as the best evidence, defendant endeavoring by such oral testimony—merely his personal construction in his own favor—to prove that he was agent for the sale of said machinery, rather than independent purchaser and dealer on his own account (as plaintiff contends the correspondence shows), and that his endorsement was not intended as an absolute guaranty, to wit:

" 'A. In consequence of my writing, complete estimates and prices for mills were furnished me, and I acted with the knowledge of the Richmond City Mill Works— Mr. Lyles: The matter of prices ought to have been in writing; let him produce the writing. (Defendant then testified they were lost.) Mr. Muller: That relieves the matter from my friend's objection. Mr. Lyles: I do not think so. It does not permit him to testify to any relations which were based upon the papers themselves. I do not think it is sufficient for one who has had a catalogue of machinery of a machin-

ery institution to testify as to its loss and contents. He should have given notice to produce such a catalogue, because it is always presumed that a printed catalogue like that, that the party who had it printed can produce it. The Court: I do not see what the contents of a catalogue has to do with it. Do not see the necessity of going into the contents. Mr. Muller: He is stating the connection between himself and the Richmond City Mill Works. The Court: Leave out everything in reference to correspondence and give a plain statement of your connection, and we will get along better. Mr. Lyles: Your Honor understands us as objecting to his testimony. He is going to testify from conclusions of correspondence. There was no personal conference between them. Mr. Muller: My friend is in error about that. The Court: Go ahead. A. I began, with their consent and knowledge, to solicit business— Mr. Lyles: We object. If their knowledge and consent is in writing he must produce it. The Court: Go ahead. A. To solicit business in the city for the Richmond City Mill Works for their flour mill system. * * * I actively canvassed this State from one end to the other for the Richmond City Mill Works, selling their machinery for them, soliciting trade for them, and I sold one or two of these large outfits for them— Mr. Lyles: Our objection goes to all of this * * *. He is now testifying to the result of the correspondence; his idea of the result of the correspondence * * *. The Court: This testimony ought to go in on the question of *bona fide* holder of the notes. Mr. Lyles: We object on the ground that if he had written authority for them, he must produce it; he has no right to testify what he had done by authority contained in a written instrument or correspondence. The Court: I do not understand this witness to say that he had written correspondence on this. The Witness: Great many of them I did not * * *. Richmond City Mill Works were in the habit of sending me inquiries in this State. It was

understood between us that I should be their exclusive agent— Mr. Lyles: We object to his understanding. The Court: Have you a written contract with them? A. No, sir. I am trying to explain how the business grew up. Mr. Lyles: From the correspondence? * * * The Court: Go ahead. The Witness: Under arrangements that had grown up between us and the understanding I should have their exclusive agency of this State, they sent me inquiries from all over the State which I went to see, soliciting this trade for them. During those three or four years of soliciting I effected the sale of three mills * * * (including this), and they recognized me as their agent by sending me all these inquiries and directing me to go— Mr. Lyles: Does your Honor rule he can testify to their sending these inquiries when all were accompanied by letters? If a matter is done in writing, no matter what it is, the writing is the best evidence. (Objection overruled.) Witness: Well, as I said before, they sent me inquiries all over this State. I sold this machinery for them, and would make settlements with them, had correspondence with them concerning it. They would send me directions, blue print for putting up this machinery and directions of that kind.'

"It is submitted that there was error in thus allowing defendant to testify of the effect and understanding of transactions by correspondence, the correspondence being the best evidence, and plaintiff suffered thereby, in that defendant was permitted to present to the jury, apart from the correspondence which was the best evidence, defendant's own deductions and plausible argumentative testimony that he was, after all, merely an agent 'soliciting this trade for them,' and not debtor on the notes endorsed by him.

3. "Because his Honor erred in allowing the defendant, Badham, over the objection of the plaintiff, to testify as to course of business by correspondence, and his conclusions therefrom of his agency in the sale of machinery for which the notes sued on were given and endorsed by him,

and his non-liability by said endorsement, instead of requiring an effort to produce the writing as the best evidence, and so allowed the defendant to testify that he was not the *bona fide* guarantor of the notes sued on, but acted as the representative of the machinery company through which the plaintiff claimed, to wit:

" 'Q. When you would sell one of these large plants, describe the method you would pursue. A. Well, I would send the order in to the Richmond City Mill Works for the machinery, describe what it was for * * * and they would ship it to the customer; ship it to the original purchaser, and under my agreement, I had to put that machinery up; that is, my mechanics had to put it up, according to the blue prints, the plans that the Richmond City Mill Works furnished. Mr. Lyles: At the risk of seeming to be against the intimation of your Honor's remarks a few minutes ago, we still submit that it is incompetent for this witness to go ahead and testify as to these orders, or anything else, having been in writing, until he has taken the proper steps showing that he has given notice to produce them, then he can offer secondary evidence of its contents. The Court: He is not testifying to the contents of the writing. Mr. Lyles: I think he is. He said he sent orders to these people for this machinery. He is showing that he sent in orders, and that shows a written instrument. The Court: I have not observed anything more than that this witness is giving a general statement of his connection with these people * * *. A. To make up a complete plant, I would sell the engine and boiler of the engine company I represented and the flour mill machinery from the City Mill Works, and the pulleys and shafting from the people I bought those things from, and the belting which I usually obtained in Columbia. Q. When you had settlements with the purchaser, how would you arrange them? A. That portion that belonged to the Richmond City Mill Works I would take good notes and turn them over to them, if

notes, and with the other manufacturers the same way. I would divide up the whole order according to their interest in that order, and made settlement that way. Q. Was that done in the case of the Huffman machinery? A. Yes, sir. Mr. Lyles: All of it was in writing, and we object to his testifying. * * * The Court: Was that done in writing? A. I sent the notes to these people in a letter accompanying the notes when I sent them to them. The Court: Do you expect them to produce that letter; haven't you got it? Mr. Lyles: We have it. If he gives us notice to produce it, we will produce it right now. The Court: He has not got to the point of settlement yet. Go ahead. Q. (By Mr. Muller): That is the way you conducted the Huffman transaction? A. Yes, sir * * *. Q. * * * About what time did you first make that first trade with Huffman for the Richmond City Mill Works— Mr. Lyles: We object. The important point is whether he ever made the sale to S. J. Huffman for the Richmond City Mill Works— The Court: Did you make the sale for the Richmond City Mill Works? A. Yes, sir; in the manner I have just described.'

"It is submitted that his Honor erred in allowing said oral testimony as to deductions of witness based upon correspondence, instead of requiring the correspondence as the best evidence, and that the error was harmful, in that the defendant was allowed to give as evidence his conclusions and opinions that he was acting 'for the Richmond City Mill Works,' and thus was the agent of said company, and not himself responsible for the purchase money of the goods, as contended for by plaintiff.

4. "Because his Honor erred in allowing defendant, Badham, over plaintiff's objection, to testify to complaints and representations made to him by Mr. Huffman as to alleged defects in the machinery for which the notes sued on were given, to wit:

" 'The Witness: Huffman notified me that the machinery— Mr. Lyles: We object to anything that Mr. Huff-

man notified him of. The Court: Go on with it. The Witness: Huffman notified me that the mill was not doing anything like it was guaranteed to do; that he could not get over twenty-five bushels a day out of it, and that the yield of flour was so poor that it was worse than any of the old country mills, and that he could get no customers; that people were leaving him because he could not get enough flour per bushel of wheat, and he said if things did not get better he would throw it back on my hands, and he refused settlement for it until it was good.'

"It is submitted that said testimony was hearsay.

5. "Because his Honor erred in allowing defendant, over plaintiff's objection, to testify to statements made to him by Huffman, as follows, to wit:

" 'Huffman came to my office and said: Instead of being all right, it was all wrong, and he not only refused settlement for the machinery, but wanted us to take it away from there, that it had damaged him; that he could not get the quality or the quantity of flour out of it, or, rather, the amount of flour per bushel that his customers demanded; that he could not get over thirty or thirty-five pounds, and that it had absolutely ruined him; that he could not do any grinding; people would not patronize him. I notified the Richmond City Mill Works of these facts and explained to them why the settlement had not been forthcoming for this machinery. Mr. Lyles: Your Honor understands us as objecting to all of that— Q. Did Mr. Huffman get any use of the mill? A. He said not.'

"It is submitted that said testimony was hearsay.

6. "Because his Honor erred in allowing the defendant, over plaintiff's objection, to testify to statements made to him by Mr. Haughton, an officer of the machinery company, to which defendant had endorsed the notes herein (and of which defendant claims to have been agent rather than purchaser), and which company had endorsed said notes to plaintiff, said statements being made after the notes had

passed from his company into the hands of the plaintiff, and after this suit thereon had been instituted, to wit:

" 'Mr. Lyles: We object to any statement made by Mr. Haughton. The Court: That might go to show that the Richmond City Mill Works' people were not the *bona fide* holders of the paper. Mr. Lyles: How could it tend to show it? It would be hearsay testimony. The Court: Suppose the agent of the mill works had admitted it. Mr. Lyles: Would it be binding upon the First National Bank, which then had these papers?— The Court: If your theory be correct, what interest has the mill works people in these notes? If he can testify to any fact that these mill works people made an admission about the notes after the suit was brought, and after the note was assigned, it will tend to show whether they were *bona fide* holders without notice. Q. (By Mr. Muller): State what occurred. A. Mr. Haughton stated he had come down to see Mr. Lyles and Mr. McMahan about this matter, and he wanted to see me to see if we couldn't arrange some adjustment of the matter —Haughton was treasurer of the City Mill Works, and he wanted to know what proposition I had to make to the company * * * I still urged him to take back this machinery * * * He told me no, that they had too much second-hand machinery. During that conversation one of the reasons he gave me why he did not wish to take back that machinery was the fact that they could not use that system of flour milling any more, that they were using another sifter—just the heart of the whole thing—that the rollers might be used, but the sifter they were not using any more in their system. It struck me as peculiar, but he would not give me any more information along that line, so the conversation drifted back to some settlement with the Richmond City Mill Works. The bank was never mentioned at all. He finally—I forgot the amount—I told Mr. Haughton that I would ship this machinery back and would pay the freight * * * and pay him one or two hundred dollars

12—86

in connection with it to get it off my hands, and we separated; he said he would not accept my proposition, but he would take it before the directors of his mill company * * * Q. That was while that suit was pending in the name of the First National Bank? A. Yes, sir; but never said a word about the bank holding these notes, and he could not make any settlement; but, on the contrary, he said he was down here to see what settlement he could effect with me.'

"It is submitted that said testimony is hearsay and also irrelevant, being the declarations after this action brought · by the plaintiff of a person not shown to bear any relations to the plaintiff, and his Honor erred in admitting said testimony and in holding that it was relevant as tending to show whether the plaintiff was a *bona fide* holder without notice. It is submitted that said testimony was harmful error, in that it presented to the jury the alleged confession of the machinery company (strangers to this suit), that the machinery was not up to date, and that there was a failure of consideration in the notes.

7. "Because his Honor erred in allowing the defendant, over plaintiff's objection, when defendant was a witness undergoing cross-examination by plaintiff, to testify in detail and give opinions and reasonings as explanations, over and above and in addition to the answers to the questions addressed to him by plaintiff's counsel, to wit:

"Witness identifying a letter received by him from the Richmond City Mill Works, dated November 24, 1899, and read in evidence, being in part as follows:

"'We do not see how it would be possible for us to accept the order at the old prices. We have made very careful estimates, and we find that at the old basis of discounts we cannot cover the actual cost of manufacturing the machinery. The advance which we have made is moderate when the cost of production is taken into consideration. We hope that you can arrange the matter with your customer to get more money for this machinery. * * * It is

our invariable custom to sell to our own customers on terms providing for a settlement within a reasonable time after shipment. * * * The account for the last order from you stood open on our books six months before we received any cash payment, and there is still more than half the amount remaining on open account. * * * We presume that you protect yourself in making deals with your customers, and it is only reasonable that we should be protected and receive interest on deferred payments.' The Witness: May I make any comment upon that answer? Mr. Lyles: No, sir. Mr. Muller: I think when counsel asks the witness if he wrote or received a certain letter, that it will be reasonable if he has comment to make upon it to make it at the time— Mr. Lyles: The letters speak for themselves. Mr. Muller: The answer is not complete until the witness says what he deems necessary to answer. The Court: The object of examination is to give a man a chance to say what he has to say. If this witness wants to make a statement I do not see how I can stop him from making it. The Witness: I would like to comment on the letter just read. I had notified these people that I had actually sold this order, but I had done so on the basis of the old prices which they had furnished me; in the meantime, they notified me to advance the price, and I immediately wrote that letter telling them that I had already taken this order for the shipment at a subsequent date, and to know whether they would protect it or not. Then they wrote me that letter calling attention to the fact that there was a large amount open on that account. Charged against you? A. Certainly. That related to two mills we had sold— Mr. Lyles: We object to the witness explaining further. The Court: I think he ought to have the right to explain it. The Witness: I had sold two mills, one to Cook, of Newberry, and the other to the Prosperity Mill Company. I could not effect the settlement with these people because the mills were not giving

satisfaction. I remitted to the City Mill Works all cash that I obtained on them, and it left a balance due, which they called attention to in that letter. In the meantime I had sent Mr. Milne to put these mills in order, and just as soon as they were accepted by the customers * * * as soon as paid for, I remitted to the City Mill Works. That was the balance they claim was open.'

"It is submitted that said details as to other transactions were irrelevant and tended to confuse the minds of the jurors and divert them from the significance of the letter read, which showed the defendant as a customer and debtor of the machinery company; and his Honor erred in holding that the object of examination is to give a man a chance to say what he has to say; whereas, the object of the cross-examination (to which his Honor was referring) is not to give the witness opportunity to say what he wants to say, but to restrict him to the answering of such questions as his adversary wishes him to answer, the ruling in effect taking the witness from the control of the cross-examining counsel and permitting said witness to violate the rule against parol testimony to supersede a written instrument.

"The error of the practice complained of appears in his Honor's later ruling in reference to other like demands on the part of the witness to be given unlimited range in his replies, to wit: 'The Court: I have allowed the witness to comment on these letters, but they always turn out to be arguments, and I cannot allow it. You can examine him in reply to all these letters.'

8. "Because his Honor erred in allowing defendant, a witness under cross-examination, to testify in detail and give opinions and reasons as explanations, over and above, and in addition to the answers to the questions addressed to him by plaintiff's counsel, to wit:

"Witness, identifying a letter written by him to the machinery company, dated December 6, 1900, read in evidence, being in part as follows:

" 'The settlement that I shall try to effect with Mr. Huffman will be for him to give me notes for the full amount of his indebtedness due next fall. These notes I will endorse and turn over to you. I already have a mortgage over all of his property, and Mr. Huffman is a man of first-class credit in our community, and the matter will be safe and secure, although we will be forced to give him this extension, for, as stated before, I have to handle him very diplomatically, for if he should be roused to the point of fighting us, he certainly would obtain damages. As the matter now stands, I have him in the most conciliatory humor, and think that I will have but little trouble in effecting a settlement.' The Witness: I explained to these people why I had not been able to get a settlement with Huffman, and told them what I would try to do. As a matter of fact, Huffman would not do it. He would not sign anything. Huffman repudiated the whole thing, said the machinery had not come up to the guarantee, and I was trying to manage him diplomatically. Mr. Lyles: Your Honor, do we understand that this witness is allowed to make a speech to the jury. The Court: I did not mean that the witness could make an argument on each letter; I only allow him to comment on it.

"It is submitted that the foregoing statement of the witness, made pursuant to a previous ruling of his Honor that the witness, under cross-examination, might elaborate his answers and explanations as he saw fit, designedly diverted attention from his admissions of liability which he had made in his letter and injected into the evidence a third party's representations about the defects of the machinery, and thus it interfered with the plaintiff's orderly presentation of his case and control of the witness and was prejudicial, the practice of releasing the witness under cross-examination from the cross-examiner's guidance of him to a certain line of testimony transfers the control of the cross-examination from the examiner to the witness and

destroys one of the methods of searching a witness by cross-examination.

9. "Because his Honor erred in holding and ruling that the notes sued on were non-negotiable, as follows, to wit:

" 'I guess the rest of the evidence is as to the sufficiency of this mill in coming up to the guarantee. We had better discuss and dispose of the question of the negotiability of the notes. * * * I have with great reluctance relinquished the idea of the negotiability of these notes. * * * I have before me a point-blank decision of the Supreme Court (*Green* v. *Spires*) which decides that a note containing a special stipulation is a non-negotiable note. I have compared these notes with the Green-Spires case, and I cannot see any possible difference in favor of the negotiability of the notes; the difference, if any, is entirely in favor of the non-negotiability of the notes in this complaint, because in the Green-Spires case the amount of attorneys' fees is fixed; whereas, in the case here, the amount of attorneys' fees is not exceeding ten per cent., making an uncertain element. I have followed the decision in the Spires case and hold that if that clause was in the note and was altered by some third person, not a party to this note or this proceeding, what is known in law as spoliation, that note would have been a non-negotiable note, and this defense could obtain between the bank and defendant, Badham.'

"It is submitted that this ruling was erroneous, since the attorneys' fees were provided in the note to apply only after maturity, and hence the amount of the notes was fixed and certain during the currency of the notes, and they should be held negotiable.

10. "Because his Honor erred in holding and ruling that the notes were non-negotiable, as follows, to wit:

" 'There is another point in the case * * * the note contains in the body of it this clause: "With all expenses, if suit be instituted for the collection of this note." * * * The view that such stipulation does not render the note non-

negotiable * * * because that could not obtain till after the maturity of the note is obviated by the statute in this State which authorizes the bringing of a suit or action before maturity of the note. Now, if true, and it is true under section 255, B, in the Code, that suit may be brought upon a note before its maturity, and expenses incurred in that suit, as to an uncertain amount before the note is matured, .that destroys the force of the reasoning which says the note shall be negotiable because an uncertain amount cannot enter into it as an element until the negotiability is destroyed' (by maturity).

"It is submitted that this is an erroneous conclusion from the special statute allowing suit and attachment before maturity in case of a debtor departing the State with intent to defraud: (1) This exceptional remedy is not to be taken as applicable to any note until proof of the fraudulent conduct, all presumptions being against the probability of fraud; (2) it is against public policy to construe a note so as to render it possible for the maker to defeat its negotiability, and lessen his obligation, by resorting to a fraud— thus profiting by his own wrong—the 'suit' 'instituted for the collection of the note' contemplated and contracted for in the making of the note, cannot have been a suit before maturity provided for by the statute in case of fraudulent absconding; (3) the statute provides that if the debtor pay the debt on or before its maturity, he shall not pay the costs of the suit instituted before maturity under this section, and this provision of the statute would control so that the clause in the notes herein could not have reference to costs in a suit instituted before maturity, and there is no contingency in which these indeterminate costs could accrue till after maturity; (4) a note sued on under said section and attached, though not technically mature, would certainly be practically mature and no longer negotiable, and hence the expenses of the suit, if recoverable, must be regarded as not affecting the negotiability.

11. "Because his Honor erred in allowing defendant's witness, W. J. Elliott, over plaintiff's objection, to testify as to the rule or practice of retaining the attorneys' fee provision in the Badham notes which came under witness' eye (not the notes sued on herein), to wit:

" 'Q. Now please state what was the rule with regard to retaining or cancelling that clause in the Badham notes in the transaction of his business? Mr. McMahan: We object to this testimony as to the rule; it is irrelevant, except as to what he did as to these particular notes. Your Honor overruled our objection before. Q. (By Mr. Muller) : Was that ever allowed to be stricken out? A. Never was. Q. If parties wanted it struck out, would Mr. Badham consent? A. No, sir; he never did consent. Q. You handled a good many of these notes? A. Yes, sir.'

"It is submitted that said evidence was irrelevant and calculated to make the jury believe that such practice would tend to prove that defendant had not himself made the erasure.

12. "Because his Honor erred in allowing defendant's witness, Milne, over plaintiff's objection, to testify as to defendant's practice not to allow the attorneys' fee provision to be stricken out when parties were signing notes to him, to wit:

" 'Q. About these notes that you heard witnesses speak of, did you ever handle any of these notes for Mr. Badham? A. Yes, sir. Q. Do you remember that clause, "If it becomes necessary to employ an attorney to collect this note, a further sum of not exceeding ten per cent. for fees"? A. Yes, sir. Q. Did Mr. Badham ever allow that clause to be stricken out? (Objected to. Allowed.) A. Not to my knowledge. I had trouble once in Hampton county about that clause, and wrote to Mr. Badham for instruction, and his reply to me was that the notes must be signed just as they are made.'

"It is submitted that the said evidence was irrelevant, and his Honor's allowing it tended to mislead the jury as to its value.

13. "Because his Honor refused to allow the plaintiff in reply to interrogate the witness, A. C. Moore, as to the appearance under the microscope of the signature of S. J. Huffman to the notes in question to show that such signature was written after the alteration in the notes, his Honor refusing the same upon the ground that such testimony was not in reply.

14. "Because his Honor refused to allow the witness, T. H. Gibbes, to testify as an expert that the signature of the said S. J. Huffman had been put to said notes after the alteration in question, his Honor refusing to allow the same upon the ground that such testimony was not in reply.

15. "Because his Honor erred in charging the jury that the notes sued on were 'not negotiable,' and the question was for the jury 'just as though the suit were between the Richmond City Mill Works and Badham.' It is submitted that his Honor should have charged that the notes were negotiable (if the erasure was made by Badham or with his consent, or before his endorsement of them), and that the defenses which might have existed against the original payee were precluded (subject to the condition stated as to the erasure).

16. "Because his Honor erred in charging the jury that the notes were non-negotiable on the ground of their containing the provision for expenses of suit if suit be instituted; whereas, his Honor should have held that such expenses could not accrue until after the maturity of the notes, and hence said provision did not affect the negotiability.

17. "Because his Honor erred in charging the jury that they must find for the defendant 'if the evidence does not satisfy you by the greater weight that the bank is the owner; whereas, his Honor should have charged that the

notes were negotiable (subject to the condition as to erasure only), and the holder was presumed to be the owner.

18. "Because his Honor charged the jury as follows, to wit: 'If the jury believe from the evidence that at the time of the commencement of this action these notes really belonged, and now belong, to the Richmond City Mill Works, and not to the First National Bank of Richmond, Indiana, and that this action is brought in the name of the bank for the benefit of the Richmond City Mill Works under some private agreement or understanding between the two corporations, then the jury must find for the defendant;' thereby erring in indicating to the jury that there was any evidence of such a fact upon which they might find the same.

19. "Because his Honor charged the jury as follows, to wit: 'That if the jury believe from the evidence that the Richmond City Mill Works warranted or represented the flouring mill machinery, for which the notes were given, to have a certain capacity, and that it fell short of that capacity, then (1) such failure of the machinery to develop the capacity so warranted or represented would of itself amount to a good defense for the defendant, by way of discount, and would entitle him to a reduction of the price of the machinery represented by the notes by any amount that the jury may believe from the evidence would fairly represent the diminution in value of the machinery caused by such deficiency of capacity; (2) and if the jury also believe from the evidence that before the commencement of this action Sam J. Huffman, or the defendant, offered to return the machinery to the plaintiff, and the plaintiff declined or failed to accept a return thereof, then the jury should find for the defendant on this ground; which, it is submitted, was erroneous in the following particulars, to wit:

"(a) It instructed the jury that if there was a warranty by the Richmond City Mill Works of the machinery in

question to have a certain capacity, and any failure of the machinery to develop that capacity, even to an immaterial extent, such failure would itself amount to a good defense.

"(b) It instructed the jury that a mere representation by said Richmond Mill Works that such machinery would develop a certain capacity, and a failure of said machinery to develop that capacity, such failure would amount to a good defense, even though such representation might not have been accompanied by any fraud or overreaching.

"(c) It instructed the jury that a failure of the machinery to develop the capacity warranted or represented, would of itself amount to a good defense, regardless of whether efficient means had been used by Mr. Huffman or Mr. Badham to properly develop the capacity, and regardless of whether the defect might not have been remedied.

"(d) It instructed the jury that if Sam J. Huffman offered to return the machinery to the plaintiff before the commencement of this action and the plaintiff refused to receive the same, the jury should find for the defendant on this ground regardless of the extent of the failure and regardless of the fact that the machinery had been sold to defendant, Badham, several years before this action was commenced, and that settlements and adjustments had been had between said Mill Works and Badham, which were claimed to have covered all alleged failures of the machinery.

20. "Because his Honor charged the jury as follows, to wit: 'That if the jury believe from the evidence that the defendant, by his endorsement of these notes, intended to guarantee their payment only in case the machinery came up to the representations or guaranty of the Richmond City Mill Works, if they believe from the evidence there were such representations or guaranty, then they must find for the defendant, unless they believe from the evidence that the machinery did come up to such representations or guaranty;' which, it is submitted, was erroneous in the following particulars, to wit:

"(a) It left it to the jury to find whether the defendant intended to limit his guaranty of the notes; when the whole contract being in writing contained in the correspondence between the parties, he should have instructed the jury as to what guaranty was intended.

"(b) It put the burden upon the plaintiff of proving affirmatively that there had been no failure of the machinery to come up to the warranty or representations, and that they should have no regard to the degree of such failure, or whether such failure, if any, had been adjusted between the parties or remedied by the Richmond City Mill Works.

21. "Because his Honor charged the jury as follows, to wit: 'Now, upon this question, gentlemen of the jury, of the alleged failure of the machinery to come up to representation or guaranty, and the allegation of such failure, and that the machinery was returned, or offered to be returned, or offered to be returned to the parties, why, that involves the question of the nature of the contract as you may see it from the testimony. I can give a case cited in argument which illustrates that point. That is. where a man in this State bought a certain lot of jewelry and fancy articles under the contract that he was to receive with that jewelry a showcase in which it was to be displayed, and that by displaying that jewelry and these articles in the showcase, certain sales could be and would be guaranteed, and the company which sold the goods shipped him all the goods, but did not ship him the showcase in time for him to carry on his trade and, therefore, he refused to accept any of the goods and offered to return them to the seller; the seller, however, refused to accept the return of the goods and brought suit against him for the value of the goods which were furnished, not including the showcase. The Court held in that case that it appeared from the testimony that the showcase was an essential part of the contract, it was essential in making a proper display of the goods to carry out the guaranty of the sale of those goods,

and as the failure to deliver the showcase was a failure in a material and important element of the contract, that this man had the right to reject all the goods, to refuse to accept them, to repudiate the contract entirely, and if he did so and made a *bona fide* offer to return the goods, which was refused, the company could not recover against him for such goods shipped; that the failure of an essential element, in delivering the showcase, and the offer to return such goods as had been shipped to him, why, the contract was at an end and the party could not recover.

"'You can take the contract and see if the principles involved in that case are applicable to this.'

"It is submitted that said charge was erroneous in the following particulars:

"(a) It instructed the jury that they must determine what was the contract between the parties, when the entire contract was in writing, embodied in the letters of the defendant Badham and those of the Richmond City Mill Works, which had been offered in evidence.

"(b) It instructed the jury that a mere failure to come up to the representations of the Richmond City Mill Works would be sufficient to authorize the said Huffman or the defendant Badham to offer to return the machinery.

"(c) It instructed the jury that a failure of the machinery to come up to the representations or guaranty of the Richmond City Mill Works, even in a slight particular, and an offer of the defendant Badham, or Sam J. Huffman, to return the machinery would be a sufficient defense to the action.

"(d) It misapplied the decision of this Court in the case of *Pratt & Co. v. Frasier & Co.*, in 72 S. C., inasmuch as after testimony had been offered in this case of a settlement and adjustment of all disputes as to the alleged defects, and the undisputed testimony had shown that the defendant had repeatedly promised to make settlement and several years of time had elapsed, it instructed the jury that

the defendant Badham, or Sam J. Huffman, might have offered to return the machinery, regardless of what had happened, and thus defeat the action.

22. "Because his Honor left it to the jury to say what was the contract between the parties in question, although the same was embodied in the written correspondence between them.

23. "Because his Honor erred in refusing plaintiff's request to charge, to wit: The law makes certain presumptions in favor of the holder of a negotiable promissory note:

" '(1) The law presumes that the person in possession of the note is the owner, and that he acquired it for value and before maturity, in the usual course of business, in good faith, without notice of defenses to the payment of the note; in other words, this presumption, unless rebutted by proof, would cut off all defenses, because the notes are to pass current, like money, good in the hands of the holder without regard to private agreements or understandings that may have existed between previous parties.

" '(2) In such a case, therefore, the consideration cannot be enquired into.

" '(3) The endorsement and delivery of such a note transfers the title thereof to the endorsee, and includes and carries the promise of the endorser to pay the note if the maker does not pay it at maturity if the note is duly presented for payment at the place therein specified and payment is demanded and refused and notice of presentment and demand and of protest for non-payment is duly given to the endorser.

" '(4) But there is a provision in the body of these notes —"Presentment for payment and protest waived," and, therefore, I charge you that it was not necessary for the owner and holder of these notes to present them for payment and protest them for non-payment in order to fix liability on the endorser, he having by his endorsement of

the notes with these words in them waived that condition to is liability.'

24. "Because his Honor erred in refusing plaintiff's motion for a new trial made upon the following ground, to wit: 'Because his Honor erred in charging without modification defendant's request numbered 6-B (2), to wit:

" 'That if the jury believe from the evidence that the Richmond City Mill Works warranted or represented the flouring mill machinery for which the notes were given to have a certain capacity and that it fell short of that capacity;

" '(2) And if the jury also believe from the evidence that before the commencement of this action Sam J. Huffman, or the defendant, offered to return the machinery to the plaintiff and the plaintiff declined or failed to accept a return thereof, then the jury should find for the defendant on this ground;'

"Whereas, it is submitted that his Honor should have modified said charge by adding words to the effect that such offer to return the machinery cannot relieve the defendant unless made before the acceptance of the machinery or within a reasonable time after the discovery of defects latent and not known and waived at the time of the acceptance of the machinery and settlement therefor, if there were such acceptance and settlement, and took from the consideration of the jury the evidence in the cause tending to show that even if the machinery had been defective, any defense based thereon had been adjusted and waived in the settlement which occurred subsequent to knowledge of the alleged defect.

25. "Because his Honor erred in refusing plaintiff's motion for a new trial made upon the following ground, to wit:

" 'Because his Honor erred in his illustration, or statement, from the case of *Pratt & Co.* v. *Frazier & Co.,* in 72 S. C., 368, in further explanation of the above charge

in that in charging the jury that a party who had bought certain jewelry for sale, and therewith a showcase necessary for the display of the jewelry for sale, and to whom the seller shipped all the goods except the showcase, was justified in refusing to accept any of the goods, and in offering to return them to the seller and thereby rescinding the contract, he also charged without qualification that it was held in that case "that this man had the right to reject all the goods, to refuse to accept them, to repudiate the contract entirely, and if he did so and made a *bona fide* offer to return the goods which was refused, the company could not recover against him for such goods shipped;" whereas, his Honor should have charged that the "right to reject all the goods, to refuse to accept them," is not of unlimited duration after receiving such part of the goods as arrived, and was exercised, in the case which he cited, promptly, with a notification to the plaintiff that the goods were in the depot subject to plaintiff's order, and that defendant declined to receive said goods, and his Honor erred in charging in effect that, regardless of time or circumstances, the purchaser had the right "to repudiate the contract entirely," to make a *"bona fide* offer to return the goods," and thereby release himself from obligation,' even after there had been, as shown by the evidence in this case, a settlement and adjustment of all disputes as to the alleged defects.

26. "Because, at the conclusion of his charge, against the suggestion and request of the counsel for plaintiff, his Honor refused to instruct the jury that they could have or call for any letters or any of the documents offered in evidence, and ruled that, while they might come out and call for the reading, they did not have the right to have such papers with them without the consent of counsel."

*Messrs. Lyles & McMahan,* for appellant, cite: *Notes are negotiable:* 69 S. C., 70; 12 Rich., 445; 18 S. C., 282;

28 S. C., 504; 48 S. C., 308; 71 S. C., 107; 81 S. C., 63; 62 S. C., 69; 39 Am. St. R., 88; 24 Am. St. R., 832; 48 Am. St. R., 38; 65 Pac., 417; 23 S. E., 81; 33 S. E., 51; 46 N. W., 574; 85 Am. Dec., 280; 32 N. E., 495; 41 N. E., 617; 35 Ind., 103; 82 Ind., 370; 47 N. E., 476; 32 Ia., 185; 56 N. W., 458; 21 Am. R., 212; 44 Pac., 603; 21 Am. R., 209; 23 La. Ann., 767; 122 Mass., 67; 23 So., 394; 28 Am. St. R., 461; 30 Am. R., 811; 8 Neb., 24; 43 N. W., 241; 63 N. W., 37; 32 Pac., 763; 56 Am. St. R., 778; 37 S. W., 627; 49 Pac., 777; 33 Pac., 1056; 2 Fed., 44; 16 Fed., 89; 31 Fed., 648; 52 Fed., 191; Dan. Neg. Inst. Par., 62a; 1 Randolph Com. Paper Par., 205; 31 Fed., 648; 2 N. W., 45; 56 Ga., 264; 56 Ia., 544. *Sec. 255 B. Code of Proc. does not apply here:* 28 S. C., 518; 111 Mass., 523; 119 Mass., 137; 70 Mo., 339; 82 Ind., 370; 37 S. C., 450. *Holder of negotiable note is presumed to be the owner:* 1 Strob., 302; 28 S. C., 143; 64 S. C., 509; 4 Ency., 318; 1 Bail., 355; 8 S. C., 302; 32 S. C., 538. *Its consideration cannot be questioned:* 23 S. C., 239; 32 S. C., 545. *Admissions of payee after transfer are not admissible:* 28 S. C., 143; 32 S. C., 546; 2 McC., 457; 12 Rich., 363; 1 Green. Par., 172; 16 Cyc., 996. *Even if note is non-negotiable they are inadmissible after assignment and notice to debtor:* 16 Cyc., 994; 12 Rich., 367; 4 Rich., 422; 57 S. C., 471; 1 Green., sec. 190; 18 S. E., 252; 19 S. E., 656; 36 S. E., 265; 49 S. E., 349. *Issue of ownership is not for jury:* 32 S. C., 538. *Custom of defendant in retaining collection clause in note irrelevant:* 59 S. C., 589; 53 S. C., 295; 44 S. C., 227; 40 S. C., 481; 30 S. C., 365; 37 S. C., 16; 30 S. C., 615; 24 S. C., 297; 17 S. C., 134; 22 S. C., 561; 1 Speer., 114; 17 Cyc., 274; 11 Ency., 508. *Error prejudicial:* 2 McC., 157; 32 S. C., 538; 42 S. C., 121; 47 S. C., 488. *Declaration made to defendant by payer incompetent:* 1 Green., secs. 98-126; 16 Cyc., 1192-5; 26 S. C., 235. *Error to refuse evidence in reply:* 12 Rich., 387; 2 Ency., 275; 2 McC., 161; 25 S. C., 148; 43 S. C., 108; 52 S. C.,

81; 59 S. C., 136; 16 S. C., 486; 27 S. C., 69; 28 S. C., 37; 31 S. C., 309; 43 S. C., 99; 44 S. C., 349. *Oral testimony of contents of writings error:* 6 S. C., 69; 4 Strob., 59; 39 S. C., 442; 3 Brev., 244; 17 Cyc., 489; 12 L. Ed., 36; 59 S. C., 590; 55 S. C., 277; 37 S. C., 299; 22 S. C., 198; 21 S. C., 429; 5 Rich., 372; 2 Rich., 144; 52 S. C.; 82; 43 S. C., 95; 17 Cyc., 471-3, 543. *Contract between defendant and Mill Works, not for jury:* 17 S. C., 477; 3 S. C., 253; 15 S. C., 10, 302; 19 S. C., 121; 24 S. C., 497; 26 S. C., 258; 46 S. C., 220; 59 S. C., 591; 66 S. C., 22. *Jury should have been permitted to carry letters into room:* 12 Ency., 491; 22 So., 585; 62 N. H., 298; 29 Ark., 24; 68 Ia., 107; 71 Mo., 617; 65 Pa. St., 416; 24 Pa. St., 507; 50 S. C., 109; 4 Allen., 378; 63 N. W., 755; 63 Me., 25; 50 Atl., 811; 60 Barb., 527; 55 Barb., 497; 51 S. C., 412; 59 S. C., 81. *Rescission of executed sale for breach of warranty:* 2 Rich., 40; 37 S. C., 7; 40 S. C., 111; 74 S. C., 206; Benj. on Sales, 546; 30 Ency., 190; 72 S. C., 368. *Right to rescind, if any, has been lost:* 30 Ency., 193; Benj. on Sales, 1158; 63 Ga., 122; 51 Mo. App., 75; 29 Neb., 293; 23 Ala., 848; 55 Mo. App., 617; 72 N. Y. App. Div., 121; 30 Ency., 195; 28 O. St., 16. *Burden on defendant of showing breach of warranty:* 37 S. C., 7; 70 S. C., 93; 30 Ency., 230.

*Mr. D. W. Robinson,* contra, cites: *Erasure of collection clause:* 78 S. C., 143; 82 S. C., 89. *Note not negotiable:* 4 Ency., 1, 81; 28 S. C., 504; 48 S. C., 308; 41 S. C., 81; 69 S. C., 65; 71 S. C., 111; 62 S. C., 469. *Clause reserving title destroys negotiability:* 40 Am. R., 313; 37 Kan., 510; 59 Ia., 645., 73 Mich., 493; 3 Va., 895; 55 N. H., 308; 25 Minn., 530; 81 S. C., 66. *Evidence in reply is within discretion of trial Judge:* 79 S. C., 83; 35 S. C., 537; 43 S. C., 100; 76 S. C., 532. *Effect of breach of warranty:* 74 S. C., 202; 78 S. C., 427. *Seller must show fulfillment of warranty:* 80 S. C., 297; 47 S. E., 604.

*Different construction of writings is for jury:* 24 S. C., 128; 101 U. S., 263; 1 Green., sec. 277. *Plaintiff must show he acquired note before maturity:* 32 S. C., 539; 23 S. C., 250. *Giving papers to jury is within discretion of Judge:* 65 S. C., 258..

June 30, 1910. The opinion of the Court was delivered by

JUDGE DEVORE, *Acting Associate Justice in place of Mr. Justice Hydrick, disqualified.* For the purpose of this opinion it will be necessary only to state that this was a suit commenced 8th August, 1905, based upon two promissory notes set out in the complaint; each being the basis for a separate cause of action, as will appear from the complaint herein.

The main question involved in the Court below, as well as in this Court, is whether said notes are negotiable; it will, therefore, be important to have a copy inserted here.

"$785.00. Columbia, S. C., July 12, 1902. On or before the first day of January, 1903, for value received in one machinery as per contract November 23, 1899, I, the undersigned, of Richland county, State of South Carolina, promise to pay to the order of V. C. Badham, of Columbia, S. C., seven hundred and eighty-five dollars, negotiable and payable at the Carolina National Bank, Columbia. Without offset, with interest at the rate of 8 per cent. per annum after maturity until paid, waiving all relief whatever from valuation, appraisement or exemption laws, with all expenses if suit be instituted for collection of this note. And it is expressly understood and agreed that the said V. C. Badham neither parts with the title, nor do the undersigned acquire any title in the property enumerated herein until this note and all other notes given in payment for same, and all extensions and renewals thereof are fully paid. And in case it becomes necessary to employ an attorney to collect this note, a further sum, not exceeding

10 per cent. for fees. Presentment for payment and protest waived. Sam J. Huffman. P. O. Congaree, Richland Co., State of S. C."

The following endorsements are on the back of the said note: "Pay to the order of Richland City Mill Works. V. C. Badham. Richmond City Mill Works. By H. A. Moore, Treasurer. Pay to the order of any Bank, Banker or Trust Co. All previous endorsements guaranteed. First National Bank, Richmond, Indiana. G. R. DuHadway, Cashier."

The other note is identical with the above, except the last endorsement, the amount and date of maturity; and these differences do not affect the question of negotiability; in other words, both notes must bear the same fate so far as that question is concerned.

According to the case, another action previous to this was brought on the notes against the maker, Sam J. Huffman, and V. C. Badham, the defendant herein, jointly, but was discontinued and this one commenced thereafter against V. C. Badham, because S. J. Huffman, in the former, answered and pleaded as a defense breach of warranty, alleging that the machinery was sold to him by Badham as agent for the Richmond City Mill Works, and that he and the Richmond City Mill Works, as an inducement to him, the said Huffman, to buy, had represented and warranted that said machinery would have a certain capacity of production per day, and said notes were given and accepted upon condition that he would not be liable unless the machinery upon trial proved to have such capacity, and same had failed to develop such capacity. The defendant, Badham, answered in that suit and virtually set up same defense. The plaintiff, in order not to become involved in litigation with said Huffman upon that defense, as above stated, discontinued that suit and instituted this one against V. C. Badham alone.

Badham, in substance, sets up same defense here as in the other suit. In this suit he alleges that he, as agent of Richmond City Mill Works, had full power and authority to make, and as such did make, the representations, and that he accepted and took the notes subject thereto and that his endorsement on said notes was conditional, that after a fair trial said machinery did not have the producing capacity of fifty barrels of flour per day, as represented by him to said Huffman.

On the trial in the Court below his Honor Judge R. W. Memminger, presiding, held the notes to be non-negotiable. Said trial resulted in judgment for defendant.

The case was heard in this Court, at November term, 1909, involving twenty-six exceptions, almost all of which will depend upon negotiability or non-negotiability of the notes.

Exceptions 9, 10, 15 and 16 in different forms raise the question of negotiability, and will be considered first and together.

In so far as our own decisions are concerned, beginning with *Bank* v. *Strother,* 28 S. C., 504, 6 S. E., 313, and coming on down to *Machine Co.* v. *Badham,* 81 S. C., 63, 61 S. E., 103, the last utterance of this Court upon the subject, for one reason or another, there is a difference of opinion among the Supreme Court Justices on the question under consideration. The Court does not seem to have ever been a unit in any of the cases except the Strother case. In that case the note contained three provisions: 1st. "All counsel fees and expenses in collecting this note, if it is sued or placed in hands of counsel for collection. 2d. Gives payee 'power to declare this note due at any time they may deem it insecure, even before maturity.' 3d. With exchange on New York."

Mr. Chief Justice McIver, in delivering the opinion of the Court, held the note to be non-negotiable, mainly on the ground that it contained the provision "with exchange on

New York," for, with reference to the other two provisions, he uses this language: "If, however, there was any doubt as to the effect of either of these stipulations, there can be none as to the effect of the exchange provision as above." Thus clearly showing that he was not fully satisfied, that the other two provisions affected negotiablity.

The next case, *Sylvester Beckley Co.* v. *Alewine,* 48 S. C., 308, 26 S. E., 609; 37 L. R. A., 86, the note provided for "ten per cent. attorney's fees for collection." Mr. Justice Gary, delivering the opinion of the Court, said that *Bank* v. *Strother,* held "that uncertainty in a note prior or subsequent to maturity destroyed its negotiability." Mr. Chief Justice McIver concurred in the opinion. Mr. Justice Pope concurred in the result on another ground. Mr. Justice Jones dissented as to question of negotiability.

The next case, *White* v. *Harris,* 69 S. C., 65, 48 S. E., 41, the note contained the provision, "we agree in default of payment after maturity to pay ten per cent. for attorney's fees for collection." Mr. Chief Justice Pope, delivering the opinion, held the note to be negotiable, for the reason that the attorney's fees were definite and certain. Mr. Justice Gary dissented for the reason stated in the Sylvester case.

The next case, *Green* v. *Spires,* 71 S. C., 107, 50 S. E., 554, the note contained a provision "to pay all costs and expenses, including ten per cent. attorney's fees," if "collected through an attorney or by legal proceeding of any kind." Mr. Justice Gary, delivering the opinion, held the note to be non-negotiable upon the authority of the *Bank* v. *Strother.* Mr. Chief Justice Pope concurred. Mr. Justice Jones dissented as to question of negotiability. Mr. Justice Woods concurred in the opinion of Justice Jones, saying *Bank* v. *Strother* should be overruled in so far as it held non-negotiable a note providing for payment of attorney's fees and costs of collection, which cannot accrue until after maturity.

The next case, *Machine Co.* v. *Badham,* 81 S. C., 63, 61 S. E., 1031, the note contained the provision, "negotiable and payable at the bank * * * * with all expenses if suit be instituted for collection of this note." Mr. Justice Gary, delivering the opinion, held the note non-negotiable. Mr. Chief Justice Pope concurred in the result. Mr. Justice Jones concurred in the result, but dissented on the question of negotiability. Mr. Justice Woods concurred in the dissenting opinion.

The citation of the foregoing cases will show the views of the Justices of this Court, from which it will be seen this Court has been divided on the question under consideration since the case of *Bank* v. *Strother* down to the present time.

It is very important that the law on the question involved should be settled by this Court, and rightly settled, not so much in accordance with the needs and purposes of the times with regard to commercial interest, but in accordance with sound reason as regards the question itself. Our Court being divided in this regard and there being no decision upon which we can rely for precedent, except the case of *Bank* v. *Strother, supra,* it will therefore be necessary to look elsewhere for authority.

Mr. Daniel on Negotiable Instruments, 5 ed., sec. 62a, speaking of instruments like those involved here, says: "Such instruments should, we think, be upheld as negotiable," and continues with his reasons therefor, in the text, and besides cites numerous cases to support same, and also cites the cases *contra.*

I find the text writers on the subject are about equally divided *pro* and *con.* The Courts of the several States are about equally divided.

I find that those writers and jurisdictions opposed to holding paper like this under consideration negotiable, do so mainly on the ground of *uncertainty as to amount* that will be due under the terms of the instrument. In other

words, the commercial world can not estimate the value of paper if put on the market for sale, or negotiation, hence would not know what to pay for it.

Those writers and jurisdictions who favor negotiability do so on the ground that no uncertainty as to amount due by terms of such instrument can arise until after maturity.

After a careful consideration of the authorities I am forced to the conclusion that the better reasoning leads to the following as a sound proposition of law. If a note or written instrument, otherwise negotiable, contain a provision or provisions, which do not and can not in any way have any effect on said note or written instrument until after it becomes non-negotiable by operation of law, to wit: after maturity, such provision or provisions do not render the same non-negotiable.

The provisions in the notes, involved here, that is, as to attorney's fees, and as to expense of collection, do not and cannot affect the negotiable character of the notes, because those provisions can not have any active legal operation until after maturity, when the notes by operation of law become non-negotiable.

The notes involved here are, however, non-negotiable, on account of the following provision contained therein, "for value received in one machinery as per contract November 23, 1899, I promise to pay," etc. This provision is notice to the commercial world of a contract made November 23, 1899, in connection with the purchase of the machinery for which these notes were given; the terms of the contract do not appear on the face of the notes, but it is sufficiently referred to and stated to inform those who deal with these notes they must take the contract into consideration in so doing.

The Circuit Judge, in the Court below, held the notes to be non-negotiable, which was correct, and this Court will not reverse a correct ruling, though the reason for it be erroneous or unsound.

The notes being non-negotiable, exceptions 1, 2, 3, 4, 5, 6, 7, 8, 11, 12, 13 and 14, which relate to the admissibility of evidence, can not be sustained, and are therefore overruled.

Exceptions 15, 16, 17 and 18 cannot be sustained, the notes being non-negotiable.

Exception 19 imputes error to the Circuit Judge in charging the following: "And if the jury also believe from the evidence, that before the commencement of this action Sam J. Huffman, or the defendant, offered to return the machinery to the plaintiff and the plaintiff declined or failed to accept a return thereof, then the jury should find for the defendant on this ground." Under the law of this State there can be no rescission of an executed sale for breach of warranty, except: 1st. Where this right is given in the contract of purchase. 2d. Where the seller is guilty of fraud. 3d. Where there has been an entire failure of consideration. The charge, therefore, should have limited the right of rescission to the instances above, and it should have been left to the jury to say whether or not; if the right ever existed to rescind, it had been waived by the defendant or by Huffman, in not undertaking to do so within a reasonable time.

Under the contention of the parties and in view of the testimony submitted in the case, it was error to charge as above.

Exceptions 20, 21, 22, 24 and 25 are disposed of by what has been said as to 19.

Exception 23 is overruled, as the request submitted by plaintiff is not applicable to non-negotiable paper such as is involved here.

Exception 26 is overruled, the question raised there being matter in discretion of the trial Judge.

Exception 10 is sustained in so far as the question raised therein concerns the charge in regard to sec. 255 B

of the Code, the same is not applicable here as construed and charged by the Circuit Judge, for the reason that it would have the effect of destroying altogether negotiable paper in so far as this State is concerned.

Let all the exceptions be reported with the case.

It is the judgment of this Court that the judgment of the Court below be, and the same is, hereby reversed, and the case remanded for a. new trial.

MR. CHIEF JUSTICE JONES *concurs in the result and in the separate opinion of Mr. Justice Woods.*

MR. JUSTICE GARY: I dissent from the conclusion announced herein that the notes were not rendered non-negotiable by the provision as to attorney's fees, but concur in the separate opinion of Mr. Justice Woods to the extent that the words expressing the consideration of the note "for value received in one machinery as per contract November 23, 1899," did not render the note non-negotiable.

MR. JUSTICE WOODS. I concur in the conclusion reached in the opinion of Judge DeVore that the notes in suit were not rendered non-negotiable by reason of the provision therein for attorney's fees. The learned Judge has reached the conclusion, however, that the words in the notes expressing the consideration "for value received in one machinery as per contract November 23, 1899," prevented the notes from being negotiable instruments. I dissent from this conclusion, because it seems to me not only an unsound and unfortunate limitation on the negotiability of promissory notes, but clearly opposed to authority. The notes are identical in form and need not be separately referred to. The first note is in these words:

"$785.00. Columbia, S. C., July 12, 1902. On or before the first day of January, 1903, for value received in one machinery as per contract November 23, 1899, I, the undersigned, of Richland County, State of South Carolina, promise to pay to the order of V. C. Badham, of Columbia, S. C., seven hundred and eighty-five dollars, negotiable and payable at the Carolina National Bank, Columbia, without offset, with interest at the rate of eight per cent. per annum after maturity until paid, waiving all relief whatever from valuation, appraisement or exemption laws, with all expenses if suits be instituted for collection of this note. And it is expressly understood and agreed that the said V. C. Badham neither parts with the title, nor do the undersigned acquire any title in the property enumerated herein until this note and all other notes given in payment for same, and all extensions and renewals thereof are fully paid. And in case it becomes necessary to employ an attorney to collect this note, a further sum, not exceeding ten per cent. for fees. Presentment for payment and protest waived. Congaree, Richland Co., S. C. Sam J. Huffman."

The following endorsements were on the back: "Pay to order of Richmond City Mill Works. V. C. Badham. Richmond City Mill Works. By H. A. Moore, Treasurer."

There is not a word importing that the payment of the amount promised was to be subject to or dependent on any contract of sale or any contingency whatever. Had there been such an expression, without doubt the instrument would not have been negotiable. These cases will serve to illustrate the principle. In *Dilley* v. *Van Wie,* 6 Wisconsin, 206, the note was held not negotiable. There, however, the reference to a collateral contract was not, as in the note under discussion, explanatory of the consideration, but the words, *"subject* to the provisions contained in an agreement this day made between said Carter and myself," were

inserted in the body of the instrument, qualifying and rendering conditional the promise to pay. In *Cushing* v. *Field,* 70 Maine, 50; 35 Am. Rep., 283, the note was held not negotiable because of the indorsement: "This note is subject of a contract made November 13, 1874." This was manifestly a limitation upon the promise itself and of course destroyed its certainty. In *Costello* v. *Croxwell,* 127 Mass., 293, the note was not an original promise in writing, but was itself collateral given to secure a contemporary agreement. The words, "given as collateral security with agreement," were written on the margin and it is obvious, as stated by the Court, that the note was conditioned "upon the performance of the undertaking to which this is collateral."

This case is entirely different. The promise to pay is not subject to a separate contract, nor according to a separate contract, nor subject to any contingency, but absolute and unconditional. The words relied on by the learned Judge as making the note not negotiable merely express the consideration, the reference to the contract being manifestly for the purpose of indicating a sale by which the title to the machinery had been reserved as a security for the debt. Such a reference to the consideration and the security does not take away from the paper a single element of a promissory note; it is none the less an unconditional written promise to pay a specified sum of money at a certain time to the order of the payee.

The generally recognized rule that the expression of the consideration does not affect the negotiability is thus stated in Daniel on Negotiable Instruments, vol. I, sec. 51a: "The negotiability of the instrument is not impaired by recitals or statements upon its face, which merely state the consideration upon which it was made, and impose no other liability upon any parties thereto than that for the payment of the sum of money therein expressed. Where there is a memorandum upon the instrument that it is "secured

according to the condition of a certain mortgage;" or that it was "given in consideration of a certain patent right;" or "as part pay for a pianoforte," or for any other consideration, or "and the same will be credited on your joint note to me." The statement that collateral security has been deposited for the performance of a promise contained in the bill or note is a recital only, which does not affect its negotiability; and though the recital contain the terms of the deposit, that does not alter the case, for it renders neither the amount, the time of payment, the payee, nor the engagement to pay, uncertain."

Two cases in this State make it clear beyond all doubt that neither statement of the consideration nor provision for securing the promise affect the negotiability of the instrument. And these cases seem conclusive of the question here; for as above indicated, reference to the contract of sale was made in the note merely to indicate that the note was given for the purchase money of machinery, and that by the contract of sale the title to the machinery was reserved as a security for payment of the note. In *National Bank* v. *Gary,* 18 S. C., 282, a note held to be negotiable was in these words, fully setting out the security:

"$886.00. Charleston, S. C., July 31, 1877. On the first of November, 1877, I promise to pay to M. W. Gary or order, without offset, eight hundred and eighty-six dollars, for value received, with interest from date, interest after maturity at the rate of one per cent. per month, having deposited with M. W. Gary, as collateral security, seven hundred and thirty-five dollars Greenville and Columbia Railroad second mortgage coupons, past due. And in case this note shall not be paid when due, I hereby give the said M. W. Gary authority to sell the said security, or any part thereof, for my account, on the maturity of this note, or at any time thereafter, at public or private sale, at his discretion, without advertising the same, and to apply so much of the proceeds of said security to the payment of said

note, as may be necessary to pay the same, with all interest due thereon, and also the payment of all expenses attending the sale of said security.    If the net proceeds of such security shall not cover the amount due on this note, I hold myself bound to pay the balance forthwith, after such sale, with interest, at the rate of one per cent. per month."

In *Dowie & Moise* v. *Joyner,* 25 S. C., 123, the note was in these words, expressing the consideration, the security for the debt and a distinct undertaking on the part of the payee :

"Collateral note for fertilizers.    $826.50.    Eastover, S. C., April 23, 1884.    On November 1, next, I promise to pay to the order of Dowie & Moise, eight hundred and twenty-six and 50-100 dollars at First National Bank of Charleston, for value received in fertilizers.    And to secure the payment of this note, I hereby agree on or before May 15, next, to pay to the said Dowie & Moise all moneys collected from the sale of said fertilizers, and to deliver to them all notes given for purchase of same, inclusive of freight on said fertilizers, as said collateral security for the payment of this note.    That on or about September 15, next, Dowie & Moise agree to return said planter's notes for collection for their account, and that I agree in their behalf to collect the same, and remit to them the proceeds of such notes as may be collected, or transfer the original notes which, as trustees for them, we may be unable to collect in part or in full, and this agreement to remain in force until this obligation is satisfied."

This was held to be a negotiable note, notwithstanding the agreement as to the collateral and the *agreement of the payees to return the collateral notes to the maker for collection.*

It is a well settled doctrine in other jurisdictions also that the reservation to the payee of title in the property for which the note is given or the statement of the consideration do not affect negotiability.    *Chicago Ry.* v. *Merchants*

*Bank,* 136 U. S., 268; *Choate* v. *Stevens* (Mich.), 43 L. R. A., 277; *Seigel* v. *Chicago Trust & Savings Bank,* 7 L. R. A., 537; *Windmill Co.* v. *Honeywell* (Kan.), 53 Pac., 488; *Campbell* v. *Equitable Securities Co.* (Col.), 68 Pac., 788; *Collins* v. *Bradbury,* 64 Maine, 37; *Gilpin* v. *Peoples Bank* (Ind.), 90 N. E., 91.

In *Markey* v. *Corey,* 108 Mich., 184, 62 Am. St. Rep., suit was brought on a promissory note on the face of which was written: "This note is given in accordance with the terms of a certain contract under the same date, between the same parties," and the Court held that the negotiability of the note was not affected by these words. In *Biegler* v. *Merchants' Loan & Trust Co.* (Ill.), 45 N. E., 512, an indorsement on the note was as follows: "This note is secured by a lien upon my interest in certain horses named in the agreement this day made between S. W. Liehy & Son and myself." It was held that the notes were negotiable and were not affected by the recital of the security and agreement.

In *Bank of Sherman* v. *Apperson* (Tenn.), 4 Federal, 25, the note recited that it was "for value received, being for a part of the payment on the Goree plantation purchased of said Gregg, *as per agreement* of the fourteenth of February, 1874." The Court held that the note in question was negotiable and "the recital of the consideration in the face of the note did not at all affect its negotiable character." In *Taylor* v. *Curry,* 109 Mass., 36, 12 Am. Rep., 661, a promissory note given to an insurance company and otherwise negotiable bore on its face the words: "On policy No. 33,386." The policy referred to contained a provision for a set-off in case of loss. Yet the Court held that this did not make the note contingent upon the happening of no loss and added, "a mere reference to the policy, without more, does not affect the negotiability of the note."

If a written contract had been introduced and had contained a limitation on the liability of the maker of the note,

that fact would not affect the liability of the defendant as endorser, for as we have shown, it would not affect the negotiability of the note.  But it may seem important to observe that the record shows that defendant failed to offer in evidence any written contract limiting the liability of the maker, and himself testified that there was no written contract containing any limitation of the liability of the maker of the note.

On the trial counsel for defendant did not contend that the reference to the contract of sale in the note affected its negotiability and the Circuit Judge did not so hold.  It seems to me clear that the notes are negotiable and that the judgment should be reversed and a new trial ordered for error of the Circuit Judge in holding otherwise.

As this was the main issue in the cause, and the course of the trial and the other rulings of the Court depended very largely on the holding that the notes were not negotiable, the labor of considering the exceptions in detail would be fruitless.