PIEDMONT CAROLINA RY. CO. et al. v. SHAW.

(Circuit Court of Appeals, Fourth Circuit. May 4, 1915.)

No. 1302.

1. BILLS AND NOTES ☞341—BONA FIDE PURCHASERS—FACTS PUTTING UPON INQUIRY.

A newly organized railway company entered into a construction contract, agreeing to advance to the contractor for engineering work $5,000, and the contractor agreed to procure for the railway company a loan of $75,000 on its note indorsed by its promoters. Plaintiff was then the president of a trust company, and advised the promoters to give a note, which was given by the railway company for a part of such engineering expenses, assuring them that the deal would go through. He subsequently purchased the note for value after receiving reports as to the financial condition of the promoters which he knew would lead his company to refuse to accept their indorsement for the $75,000. The enterprise fell through from failure to raise the $75,000 on the promoters' indorsement. Plaintiff, when the note purchased by him was given, had faith in the enterprise, and at that time a good part of the engineering work had been done. Pell's Revisal N. C. 1908, § 2205, provides that, to constitute notice of an infirmity in a negotiable instrument or a defect in the title of the person negotiating it, the purchaser must have had actual knowledge of the infirmity, or of such facts that his action in tak-

ing the instrument amounted to bad faith. *Held*, that plaintiff was a purchaser in good faith, as his assurance to the promoters did not make him a guarantor or surety for the contractor, and knowledge of the nature of the consideration, or that the consideration is something to be done in the future, does not affect the title of the holder of a promissory note, nor put him upon inquiry as to whether the consideration has failed.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 829; Dec. Dig. ☞341.]

**2. BILLS AND NOTES ☞482—ACTIONS—PLEADING—ADMISSIONS—"PROTEST."**

In an action on a note, the complaint alleged that when the note fell due it was promptly presented to the defendants and payment demanded in the regular course of business, and that, when the defendants refused to honor or pay it, it was promptly and properly protested for nonpayment against the makers and indorsers. The answer denied this paragraph of the complaint, except that it admitted "that said note was protested for nonpayment," and it expressly denied that the note was ever presented to the indorsers, that notice of dishonor was given to the indorsers, and that presentment was made by the holder or any person authorized to receive payment, or that notice was given to the indorsers by or on behalf of any party to the note who might be compelled to pay it to the holder, and who would have a right to reimbursement from the party to whom notice was given. *Held*, that the answer admitted presentment of the note to the maker and a refusal to pay, especially as the specific denial of presentment was limited to the denial of presentment to the indorsers, since, while a "protest" is, strictly speaking, only a formal declaration executed by the notary, the notary could not "properly" make such declaration without presentment, and moreover the word "protest," in its usual sense, implies due presentation and notice of nonpayment.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1533, 1562; Dec. Dig. ☞482.

For other definitions, see Words and Phrases, First and Second Series, Protest.]

**3. BILLS AND NOTES ☞420—NOTICE OF DISHONOR—SUFFICIENCY OF NOTICE.**

Pell's Revisal N. C. 1908, § 2240, provides that notice of dishonor of a negotiable instrument may be given by or on behalf of the holder, or any party who might be compelled to pay it to the holder, and who upon taking it up would have a right to reimbursement from the party to whom notice is given. Section 2243 provides that, when notice is given by or on behalf of a party entitled to give notice, it inures to the benefit of the holder and all parties subsequent to the party by whom notice is given. *Held* that, where a bank holding a note for collection gave verbal notice of dishonor to one of the indorsers, and all of the indorsers discussed the matter among themselves and determined to refuse payment, the notice was sufficient, as the indorsers notified each other, and this notice inured to the benefit of the holder; each of the indorsers having a right to a measure of reimbursement from the others.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1138–1140; Dec. Dig. ☞420.]

**4. COURTS ☞322—UNITED STATES COURTS—JURISDICTION—ALLEGATIONS AS TO JURISDICTION.**

In an action on a note by an indorsee thereof, brought in the Western district of North Carolina, an allegation that the note was given to the I. Co., a corporation duly chartered, organized, and existing under the laws of Delaware, sufficiently showed that the I. Co. could have brought the suit in the federal court on the ground of diversity of citizenship.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 876–881, 887; Dec. Dig. ☞322.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. COURTS ⬤⟳323—UNITED STATES COURTS—JURISDICTION—PROOF.

Where, in an action by an indorsee of a note brought in the Western district of North Carolina, the complaint alleged that the note was given to the I. Co., a corporation organized under the laws of Delaware, an admission by stipulation of the articles of incorporation, and the due incorporation and existence of the corporation, was an admission that it existed under the laws of Delaware and was a citizen of that state, and showed diversity of citizenship, as the whole record may be looked into to determine the question of jurisdiction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 885, 886; Dec. Dig. ⬤⟳323.

Diverse citizenship as a ground of federal jurisdiction, see notes to Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.]

In Error to the District Court of the United States for the Western District of North Carolina, at Greensboro; James E. Boyd, Judge.

Action by Leslie M. Shaw against the Piedmont Carolina Railway Company and others. Judgment for plaintiff, and defendants bring error. Affirmed.

Thomas J. Jerome, of Greensboro, N. C., and A. H. Price, of Salisbury, N. C., for plaintiffs in error.

A. L. Brooks, of Greensboro, N. C. (Brooks, Sapp & Williams and G. S. Bradshaw, all of Greensboro, N. C., on the brief), for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

WOODS, Circuit Judge. [1] The main question to be decided is whether the evidence justified the instruction of the District Judge to the jury to find a verdict for the plaintiff in this suit of Leslie M. Shaw, indorsee, against the Piedmont Carolina Railway Company, maker, and W. F. Snider, T. H. Vanderford, Sr., M. L. Jackson, and Thomas J. Jerome, indorsers of a promissory note given to the Interurban Company for $3,000 on September 21, 1909, due three months after date.

The production of the note by the plaintiff duly indorsed entitled him to recover, unless there was material evidence supporting some legal defense. The indorsers were promoters of an electric railway which they planned to have constructed from Spencer, N. C., to Concord, N. C. On August 12, 1909, this railway, incorporated in North Carolina under the name of Piedmont Carolina Railway Company, made a contract for the construction of the road with the Interurban Company, a Delaware corporation, as contractor. The stipulations here involved are as follows:

"The contractor shall commence engineering work not earlier than the 1st day of September, 1909, nor later than the 10th of said month, and shall prosecute the same vigorously and without unnecessary interruption, and shall prepare duplicate copies of specifications and estimates, and shall deliver one of said copies to the railroad company as soon as the same are prepared.

"Said railroad company will advance to the contractor for the engineering work necessary for the preparation of the estimates and specifications the

sum of $5,000 September 15, 1909, and the balance upon delivery to the railroad company of the location, estimates, and specifications.

\*    \*    \*    \*    \*    \*    \*    \*    •    •

"The contractor agrees to procure for the said railroad company a loan of $75,000 for a period of six months, with agreements for renewal, so that the final renewal shall extend the date of payment to a period at least six months after the said road is completed and placed in operation, the said loan to be secured by the note of the railroad company, indorsed by W. F. Snider, T. H. Vanderford, M. L. Jackson, and Thos. J. Jerome, and there shall be pledged as collateral security for the payment of said note $100,000 at par of the first mortgage bonds of said railroad company."

The railway company paid in cash $2,000 for the preparation of the estimates and specifications, and gave the indorsed note in suit for $3,000, the remainder of the $5,000 promised for that purpose. The note was indorsed to Shaw for full value on November 8, 1909. At the time the construction contract was made Shaw was president of the First Mortgage Guarantee & Trust Company of Philadelphia and was desirous that his company should finance the railway enterprise. The Interurban Company failed to construct the road, and after negotiations with several parties in the effort to discount the $75,000 note indorsed by the promoters and secured by $100,000 of bonds, the entire enterprise fell through. On the part of the defendant indorsers of the note in the suit there was evidence tending to prove (1) that the plaintiff, Shaw, earnestly advised them to give the note, assigning as a reason that capitalists would not invest until satisfied that interested parties had paid for the location, estimates, and specifications; (2) that he assured them, at the same time, that the deal would go through, that the road would be built, and they would be reimbursed for the amount in the manner provided in the construction contract; (3) that Shaw bought the note after he had received reports as to the financial condition of the promoters who were to indorse for $75,000, which he knew would lead his trust company to refuse to accept their indorsement for the $75,000 necessary for the construction of the railway.

Assuming all this to be true, and leaving out of view any evidence to the contrary, we do not think it would constitute a valid defense to the note. The North Carolina statute provides:

"2205. Actual Knowledge Necessary to Constitute Notice of Infirmity. To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same the person to whom it is negotiated must have had actual knowledge of the infirmity or defect or knowledge of such facts that his action in taking the instrument amounted to bad-faith." Pell's Revisal, § 2205.

The rule is familiar that knowledge of the nature of the consideration or that the consideration is something to be done in the future does not affect the title of the indorser of a promissory note nor put upon him the duty to inquire whether the consideration has failed. Sampson v. Hatcher, 151 N. C. 359, 66 S. E. 308; Bank v. Badham, 86 S. C. 170, 68 S. E. 536, 138 Am. St. Rep. 1043; Markey v. Corey, 108 Mich. 184, 66 N. W. 493, 36 L. R. A. 117, 62 Am. St. Rep. 698; Bank of Sherman v. Apperson (C. C.) 4 Fed. 25; Taylor v. Curry, 109 Mass. 36, 12 Am. Rep. 661. The statute of North Carolina ex-

presses the doctrine thus laid down in Hotchkiss v. National Banks, 88 U. S. (21 Wall.) 354, 22 L. Ed. 645:

"The law is well settled that a party who takes negotiable paper before due for a valuable consideration, without knowledge of any defect of title, in good faith, can hold it against all the world. A suspicion that there is a defect of title in the holder, or a knowledge of circumstances that might excite such suspicion in the mind of a cautious person, or even gross negligence at the time, will not defeat the title of the purchaser. That result can be produced only by bad faith, which implies guilty knowledge or willful ignorance, and the burden of proof lies on the assailant of the title."

There is no charge and no evidence of bad faith on the part of Shaw. On the contrary, the evidence leaves no doubt that when the note was given Shaw had faith in the enterprise and believed the contracting company would be able to secure the funds and build the road. His alleged verbal assurance that if the promoters would give the note the funds could be raised and the road would be built was not and could not have been regarded a legal obligation to become a guarantor or a surety for the contractor. It was not fraudulently made, for the evidence on both sides indicates his confidence in the enterprise. These statements, if made, were not in law or morals anything more than the expression of a strong conviction that the enterprise would succeed. Having assumed no legal obligation as an inducement to the indorsement, and having acted in good faith, such an expression in connection with the giving of the note could not under the law prevent his acquiring the note as an indorser for value.

It is true that there was evidence tending to show that the plaintiff at the time he acquired the note must have been practically certain that his trust company would not undertake to finance the road for the Interurban Company, for the reason that information received about the indorsers of the $75,000 note was not satisfactory; but it does not appear that he knew the engineering work for which the note was given had not been done, or that the contract for the construction of the road had fallen through. The uncontradicted evidence shows that a good part of the engineering work had been done, that the Interurban Company was still making efforts to finance the scheme, and that the railway company, through its promoters, made another contract with the Interurban Company to construct the road, on September 12, 1910, ten months after the note had been indorsed to the plaintiff. Under these indisputable facts, and the law applicable thereto, the conclusion is unavoidable that the note was acquired in good faith before maturity.

[2] The position is taken that the indorsers were discharged for lack of presentment, in that the statute requires presentment at maturity, and there was evidence that this note was due December 21st and payment was not demanded until December 22d, and then improperly over the telephone. We think the answer admits presentment to maker and refusal to pay. The fifth paragraph of the complaint alleges:

"That when the said note or bond fell due the same was promptly presented to the defendants and payment demanded in the regular course of business by the People's National Bank of Salisbury, N. C., and that when

223 F.—62

the said defendants refused to honor or pay the said note or bond the same was promptly and properly protested for nonpayment before W. T. Busby, a notary public, against the makers and indorsers of the same."

In response the answer contains these allegations:

"That the fifth paragraph of the complaint is not true, and the same is denied, except that it is admitted that said note was protested for nonpayment."

"It is expressly denied that said note was ever presented for nonpayment to the indorsers, Thomas L. Jerome, W. F. Snider, T. H. Vanderford, and M. L. Jackson, and it is denied that notice of dishonor or nonpayment of said note was given to the said indorsers, and it is especially denied that presentment for payment of said note was made by the holder of the same, or by any person authorized to receive payment on behalf of any holder of the same, or that notice was given to the indorsers of said note, by or on behalf of any party to the said note who might be compelled to pay it to the holder, and who, upon taking it up, would have a right to reimbursement from the party to whom notice is given."

It is true that a protest is, strictly speaking, only a formal declaration executed by the notary; but the notary could not "properly" make such declaration without presentment. Besides, the word "protest" in its usual sense implies due presentation and notice of nonpayment. Daniel on Negotiable Instruments, 926; White v. Keith, 97 Ala. 668, 12 South. 611; Wood River Bank v. First National Bank, 36 Neb. 744, 55 N. W. 239; Ayrault v. Bank, 47 N. Y. 570, 7 Am. Rep. 489; Sprague v. Fletcher, 8 Or. 367, 34 Am. Rep. 587. This view of the scope of the admission embraced in the admission of protest is made clearer by the fact that the specific denial of presentment is limited to denial of presentment to the indorsers.

[3] As to the notice of dishonor it was sufficient to give it the day following the day of presentment (Pell's Revisal, §§ 2253, 2254); and "the notice may be given by or on behalf of the holder or by or on behalf of any party to the instrument who might be compelled to pay it to the holder, and who upon taking it up would have a right to reimbursement from the party to whom notice is given." Pell's Revisal, § 2240.

The evidence shows conclusively that the indorsers controlled the corporate maker of the note, that they discussed the matter among themselves and determined to refuse payment, that one or more of them received from the bank holding the note for collection as agent of the holder verbal notice that the note had been dishonored, and that all the indorsers spoke together about the matter, thus notifying each other. This notice from indorsers to each other was sufficient, since any one of them, compelled to pay the holder, would have had a right to a measure of reimbursement from the others. The notice from the indorsers to each other inured to the benefit of the holder. Pell's Revisal, § 2243.

[4, 5] At the argument in this court a motion was made to dismiss the action for want of jurisdiction, in that it does not appear by direct averment that the Interurban Company, the payee, could have brought suit in the federal court on the ground of diversity of citizenship. The motion must be refused, since it is distinctly averred in the complaint that the note was given to "the Interurban Company,

a corporation duly chartered, organized and existing under and by virtue of the laws of the state of Delaware," and the articles of incorporation, and the due incorporation and existence of the corporation, were admitted by stipulation. This meant an admission that the corporation was chartered and existed under the laws of Delaware, and was therefore a citizen of that state. The whole record may be looked into to determine the question of jurisdiction. Sun Co. v. Edwards, 195 U. S. 377, 24 Sup. Ct. 696, 48 L. Ed. 1027; Anderson v. Watt, 138 U. S. 694, 11 Sup. Ct. 449, 34 L. Ed. 1078.

Affirmed.